IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| QVC, INC. | : | |
| Plaintiff, | : | |
| vs. | : | Civil Action No. 02-CV-2874 |
| Q VISION NETWORK, INC., | : | |
| Defendant. | : | |

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF QVC, INC.'S MOTION FOR PRELIMINARY INJUNCTION

Dated: June 10, 2002

Submitted by:

Manny D. Pokotilow, Esq.
Salvatore Guerriero, Esq.
**CAESAR, RIVISE, BERNSTEIN,
COHEN & POKOTILOW, LTD.**
Seven Penn Center - 12th Floor
1635 Market Street
Philadelphia, PA  19103-2212
(215) 567-2010

*Attorneys for Plaintiff,
QVC, Inc.*

## I.   INTRODUCTION

Plaintiff, QVC, Inc., submits this Memorandum of Law in support of its Motion under FED. R. CIV. P. 65(a), for a preliminary injunction enjoining Defendant, Q Vision Network, Inc., from using any mark confusingly similar to and dilutive of Plaintiff's federally registered marks, QVC, QVC NETWORK and Q, in connection with electronic retail services, namely the use of the names and marks Q VISION NETWORK, Q SHOP and Q SHOP TV.

It is respectfully submitted that Defendant's activities constitute acts of trademark infringement, false designation of origin, trademark dilution and unfair competition arising under the Lanham Act, as amended, 15 U.S.C. §§ 1051 *et seq.* and the statutory and common laws of the Commonwealth of Pennsylvania.  These activities are likely to confuse, deceive and mislead consumers as to the source of origin of Defendant's commercial activities and have lessened the capacity of Plaintiff's famous QVC and Q marks to identify and distinguish Plaintiff's goods and services.

## II.  RELEVANT FACTS.

### A.   The Parties.

Plaintiff QVC, Inc. is a Delaware corporation having a principal place of business located at Studio Park, West Chester, PA. (Grabell Decl. at ¶ 3.)  QVC, Inc. has numerous subsidiaries and affiliates through which it conducts business.  (*Id.*)

-1-

Hereinafter, QVC, Inc. and its subsidiaries and affiliates will be collectively referred to as "Plaintiff."

Plaintiff is one of the nation's largest and most well known home-shopping retailers. (*Id.* at ¶ 4.) It has helped create and has been a major force in the televised shopping industry since it debuted in 1986. (*Id.*) Plaintiff established a new record in American business history for first full-fiscal-year sales by a new public company, with revenues of more than $112 million. (*Id.*) By 1993, Plaintiff had become the number one televised shopping service in sales, profits, and reputation in the U.S., reaching more than 80% of all U.S. cable homes and three (3) million satellite dishes. (*Id.*) As of December 31, 2001, Plaintiff's television program was available, on a full and part-time basis, to more than 82 million homes in the United States, more than 9.2 million homes in the United Kingdom, more than 27.9 million homes in Germany and more than 5.6 million homes in Japan. (*Id.* at ¶ 5.) In 2001, Plaintiff shipped more than 92 million units to customers around the world as a result of some 133 million phone calls, leading to more than $3.9 billion in sales. (*Id.*)

Since 1996, Plaintiff has offered an interactive shopping service, QVC.COM, on the Internet, which, like its television shopping service, offers a diverse array of merchandise, online, 24 hours a day, 7 days a week. (*Id.* at ¶ 6.) Sales on QVC.COM have climbed from $15 million in 1997 to $285 million in 2001. (*Id.*)

-2-

The QVC.COM Web site handles approximately 2.4 million unique visitors each month. (*Id.*) Among the accolades that Plaintiff's QVC.COM site has received includes the prestigious CIO Web Business 50 Award from IDG's *CIO* magazine, which honors 50 outstanding Web sites across business, government, and non-profit platforms, and from Forrester Power Ranking – a leading independent Internet research firm which analyzes technology change and its impact on business, consumers, and society – a number one (1) ranking as the top general merchandiser on the Internet. (*Id.*)

Plaintiff also markets its products through mail-order catalogs and various retail outlets located in Pennsylvania, Delaware, Minnesota, South Carolina and Florida. (*Id.* at ¶ 7.)

Upon information and belief, Defendant is an Arizona corporation, having a place of business at 7944 East Beck Lane, Scottsdale, AZ 85260. (*Id.* at ¶ 30, Ex. 8.) Defendant is also in the business of providing electronic retail services. (*See id.* at ¶ 32.) In particular, Defendant has been selling general merchandise through infomercials and television program(s) and an interactive retail shopping service on the Internet. (*See id.*)

**B.    QVC's Marks.**

As mentioned, above, Plaintiff has been extensively engaged in the business of providing in interstate commerce electronic retail services, and has provided such services under the names and marks QVC, QVC NETWORK and Q. (*Id.* at ¶ 8.)

-3-

Plaintiff is the prior user and exclusive licensee of the name and mark QVC.  (*Id*. at ¶ 9.)  The United States Patent and Trademark Office ("USPTO") has granted several federal trademark registrations to Plaintiff for the mark QVC in the field of electronic retail services, namely:

| Certificate of Registration | Goods and Services | Date of First Use | Registration Date | Incontestible |
|---|---|---|---|---|
| 1,455,889 | at home shopping services in the field of general merchandise by means of cable television | 12/29/86 | 9/1/87 | yes |
| 1,930,782 | at home shopping services by means of television | 11/18/93 | 10/31/95 | yes |
| 1,945,357 | catalog and mail order services in the field of general merchandise | 12/29/86 | 1/2/96 | yes |
| 2,015,779 | retail store services in the field of general merchandise | 11/1987 | 11/12/96 | no |
| 2,098,066 | interactive retail services provided via computer and television featuring general merchandise | 12/1995 | 9/16/97 | no |

(*Id*. at ¶¶ 9-11, 15-21.)

Plaintiff is also the prior user and exclusive licensee of the name and mark QVC NETWORK.  (*Id*. at ¶ 12.) On November 8, 1988, the USPTO granted federal trademark registration to Plaintiff for the

-4-

mark QVC NETWORK (plus design) for providing at home shopping services in the field of general merchandise by means of television as Certificate of Registration No. 1,512,144. (*Id.*) On or about November 2, 1994, the USPTO accepted the Section 8 and 15 Combined Declaration of Use and for Incontestability re Certificate of Registration No. 1,512,144. (*Id.* at ¶ 13.)

In addition, Plaintiff is the prior user and owner of the name and mark Q. (*Id.* at ¶ 22.) On August 22, 1995, the USPTO granted federal trademark registration to Plaintiff for the mark Q for providing at home shopping services in the field of general merchandise by means of television as Certificate of Registration No. 1,914,291. (*Id.*) On or about September 25, 2001, the USPTO accepted the Section 8 and 15 Combined Declaration of Use and for Incontestability re Certificate of Registration No. 1,914,291. (*Id.* at ¶ 23.)

The above-mentioned Certificates of Registration and the marks covered thereby are valid and in full force and effect. (*Id.* at ¶ 25.) Plaintiff has all right, title and interest in and to Certificate of Registration 1,914,291, and the mark covered thereby, to bring this suit. (*Id.* at ¶ 26.) In addition, Certificates of Registration Nos. 1,455,889, 1,512,144, 1,930,782, 1,945,357, 2,015,779 and 2,098,066 and the marks covered thereby (hereinafter collectively referred to as the "QVC marks") are subsisting in the name of ER Marks, Inc., a subsidiary of

-5-

Plaintiff.  (*Id.* at ¶ 27.)  Plaintiff is the exclusive licensee of ER Marks, Inc., and as exclusive licensee, Plaintiff is entitled to full and exclusive use of the QVC marks.  (*Id.*)  Plaintiff has complete authorization to enforce these marks, including the right to seek injunctive relief and collect damages for infringement thereof.  (*Id.*)

Continuously, since long prior to the acts of Defendant alleged herein, Plaintiff has established a substantial market for its goods and services sold and marketed through its QVC television network, its online interactive shopping site, QVC.COM, mail order catalogs and retail stores.  (*Id.* at ¶ 28.)  The QVC and Q marks are always shown in association with the goods and services provided by Plaintiff, which have been widely advertised and extensively offered under these marks.  (*Id.*)  These goods and services have achieved fame and renown throughout the United States in view of the Plaintiff's extensive exposure through its broadcasting, advertising, promotion and sale of the goods and services in association with the QVC and Q marks.  (*Id.*)

As a result of Plaintiff's exclusive, continuous and substantial use, and its continuous, extensive sales and advertising, the QVC and Q marks have come to represent an invaluable symbol of the goodwill of Plaintiff's business and possess a very high degree of distinctiveness.  (*Id.* at ¶ 29.)  The QVC and Q marks are famous and recognized by consumers throughout

-6-

the United States as identifying goods and services which have their source, origin or sponsorship with Plaintiff, and as distinguishing such goods and services from the goods and services of others. (*Id.*)

### C.  Defendant's Unlawful Conduct.

Upon information and belief, Defendant, along with the trade and the public, are well aware of Plaintiff's prior use of the QVC and Q marks and the valuable reputation and goodwill represented and symbolized thereby. (*Id.* at ¶ 31.)  Notwithstanding this knowledge, and on information and belief, in a willing effort to infringe upon the reputation and goodwill rightfully belonging exclusively to Plaintiff, Defendant has adopted and used the marks Q VISION NETWORK, Q SHOP and Q SHOP TV, in this judicial district and in interstate commerce, for its electronic retail shopping services and as domain name components to identify its online retail services. (*Id.* at ¶ 32.)  On information and belief, well after Plaintiff had established its rights in its QVC and Q marks and after these marks had become well-known among consumers, Defendant has adopted and used the Q VISION NETWORK, Q SHOP and/or Q SHOP TV marks in connection with its infomercials and television program(s) and its interactive Web site, where Defendant retails and markets various items of general merchandise. (*Id.* at ¶ 32, Exs. 9-11.)

Despite attempts to resolve this dispute, and after having been unable to do so, Plaintiff is compelled to commence the present Motion for Preliminary Injunction. (*Id.* at ¶ 33.)

## III. QVC IS ENTITLED TO A PRELIMINARY INJUNCTION.

Preliminary injunctions are commonly granted in actions for trademark infringement, trademark dilution, false designation and representation of origin and unfair competition. Preliminary injunctions are considered appropriate in such cases because the factors which indicate a likelihood of success are often readily apparent, and irreparable injury or harm to the trademark is inherent in the situation.

The requirements to be met by one seeking a preliminary injunction have been clearly established in the Third Circuit:

> When ruling on a motion for preliminary injunctive relief, a district court must consider four factors: (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

*Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 803 (3d Cir. 1998) (citations omitted).

As Plaintiff will demonstrate herein, and at the hearing on this Motion, the evidence shows that it has satisfied all of the factors to entitle it to the preliminary relief requested.

-8-

## A.    QVC Will Suffer Irreparable Harm.

Courts have recognized the harm that a plaintiff will suffer due to the loss of control over its reputation and goodwill as a result of a defendant's infringement, and that such harm may not be adequately remedied through damages.  For example, the Court in *American Diabetes Association, Inc. v. National Diabetes Association*, 533 F. Supp. 16, 21 (E.D. Pa. 1981), *aff'd*, 681 F.2d 804 (3d Cir. 1982), stated:

> The imminent harm plaintiffs will suffer if defendants are not enjoined is the loss of control of their reputation and goodwill, which plaintiffs have established over a forty year period.  This harm is, by nature, inadequately remedied by legal means.  *Chips 'N Twigs. Inc. v. Chip-Chip. Ltd.*, 414 F. Supp. 1003, 1020 (E.D. Pa. 1976).  Plaintiffs may also suffer the loss of potential donations because people may mistakenly donate to the defendant charity and may refrain from donating to any diabetes charity in the future because of unhappy results in dealing with the National Diabetes Association.  Although these injuries are more susceptible to remedy by monetary awards, they are notoriously difficult to prove.

Similarly, in *Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir. 1990), the Third Circuit summarized the damage inherent in trademark infringement cases as follows:

> In *Ambassador East Inc. v. Orsatti, Inc.*, 257 F.2d 79 (3d Cir. 1958), we held that a plaintiff's "mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill.  If another uses it, he borrows the owner's reputation,

whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use. . . ." (quoting *Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928)

In the context of a federal trademark dilution action, former Chief Judge Cahn noted "with regard to irreparable harm, the dilution of a mark is not susceptible to the calculation of money damages. Hence, it would be impossible to place a dollar value on any damage to the . . . mark." *Wawa Inc. v. Haaf*, 40 USPQ2d 1629, 1633 (E.D. Pa. 1996), *aff'd w/o op.*, 116 F.3d 471 (3d Cir. 1997).

In *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.* 937 F.Supp. 204, 209 (S.D.N.Y. 1996), the court explained that any dilution of a trademark constitutes irreparable injury that would warrant the grant of a preliminary injunction:

> Once a trademark has become diluted, it has lost the strength it once possessed. No matter how small the dilution, the harm has been done. Dilution has been described as the gradual whittling away of a firm's distinctive trade-mark or name. Just one whittle taken from a stick destroys the possibility that the stick can ever be made whole. As the Second Circuit has recognized, dilution is itself an injury which cannot be recompensed by money damages.
>
> . . . . I have no doubt that if [Plaintiff's] trademark were diluted, that dilution would constitute irreparable harm. (citations and quotations omitted).

In addition, where a party makes a showing of dilution, irreparable injury follows as a matter of course. *Nabisco, Inc. v.*

-10-

*PF Brands, Inc.,* 50 F. Supp.2d 188, 197 (S.D.N.Y), *aff'd*, 191 F.3d 208, 222 (2d Cir. 1999).

Under the present circumstances, there can be little doubt that Plaintiff will suffer the loss and control of its reputation and goodwill which it has endeavored to establish over the years. Through Plaintiff's continuous and exclusive use, the QVC and Q names and marks have become so closely associated with Plaintiff that any other use of a similar name and mark for related services will cause consumers to associate Plaintiff with that use, even if Plaintiff is not involved. Any such use of a mark by another would, therefore, deprive Plaintiff of control over its goodwill and reputation. Defendant's use of the Q VISION NETWORK, Q SHOP and Q SHOP TV marks in connection with its electronic retail services, is such that Defendant's use can only be calculated to "cash in" on Plaintiff's valuable reputation and goodwill.

The damage to Plaintiff's reputation and goodwill that will occur as a result of Defendant's use of Q VISION NETWORK, Q SHOP and Q SHOP TV cannot be accurately ascertained or compensated for, and the injunctive powers of this Court are necessary in order to prohibit the loss which will be suffered because of Defendant's infringing use.

Accordingly, consideration of the irreparable harm factor should be decided in favor of Plaintiff.

-11-

**B.    QVC Is Likely to Succeed on the Merits of its Claims.**

Plaintiff respectfully submits that Defendant's use of the Q VISION NETWORK, Q SHOP and Q SHOP TV marks constitutes trademark infringement, trademark dilution, false designation of origin and unfair competition arising under the Lanham Act, as amended, 15 U.S.C. §§ 1051 *et seq.* and the statutory and common laws of the Commonwealth of Pennsylvania.

As will be shown, Plaintiff is likely to succeed on the merits of the above-mentioned claims and a preliminary injunction is warranted prohibiting Defendant's use of the Q VISION NETWORK, Q SHOP and Q SHOP TV marks.

**1.    QVC is Likely to Prevail on its Claim of Trademark Infringement.**

Plaintiff alleges federal trademark infringement under 15 U.S.C. § 1114(1), which provides in part:

> Any person who shall, without the consent of the registrant - (a)  use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

The appropriate standard for determining whether Plaintiff is likely to succeed on the merits on its claims of trademark infringement under the Lanham Act is a "likelihood of confusion."

-12-

*A & H Sportswear v. Victoria's Secret Stores*, 166 F.3d 197, 205 (3d Cir. 1999) (en banc), *appeal after remand*, 237 F.3d 198 (3d Cir. 2000).

The court in *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.*, 30 F.3d 466, 472 (3d Cir. 1994) addressed the standard of "likelihood of confusion" where it stated:

> The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion. . . . [L]ikelihood of confusion exists when ever consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. (citations and quotations omitted)

The concept of "source" is broader than the literal meaning of the term and it encompasses sponsorship and other associations. As stated in *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-205 (2d Cir. 1979):

> In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. . . . The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.

The source or sponsor identified by a trademark also need not be known by name, but may be anonymous. Buyers are entitled to assume that all products carrying the same trademark are somehow linked with or sponsored by a single anonymous source. *See A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 301-04 (3d Cir. 1986).

-13-

Furthermore, once a likelihood of confusion has been proven, demonstrating a likelihood of success on the merits and the other preliminary injunction factors are subsumed into the likelihood of confusion and granting a preliminary injunction is appropriate. *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983).

As will be shown, consumers are likely to assume, by Defendant's use of the Q VISION NETWORK, Q SHOP and Q SHOP TV marks, that Defendant's commercial activities are in some way sponsored, connected, owned or otherwise associated with Plaintiff.

To prove trademark infringement in violation of the Lanham Act,[1] a plaintiff must show that (1) the trademark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services. *Fisons*, 30 F.3d at 472; *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000).

---

[1]     The test for a granting of a preliminary injunction as it relates to Plaintiff's claims of trademark infringement and unfair competition under the Lanham Act and the common law is identical, and the facts which substantiate an action for trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), will support an action for false designation under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) and Pennsylvania common law trademark infringement and unfair competition. *See A & H Sportswear*, 237 F.3d at 210; *Fisons*, 30 F.3d at 473; *Gideons Int'l, Inc. v. Gideon 300 Ministries, Inc.*, 94 F. Supp.2d 566, 580 (E.D. Pa. 1999) (citations omitted); *Richards v. Cable News Network, Inc.*, 15 F. Supp.2d 683, 687 n. 11 (E.D. Pa. 1998). Accordingly, Plaintiff will not distinguish between these causes of action and only the federal trademark infringement action will be discussed for purposes of analysis.

### a.   The QVC and Q Marks are Valid and Legally Protectable.

With regard to the first two elements of an infringement action, Plaintiff respectfully submits that there can be no real dispute that the QVC and Q marks are valid and protectable marks.

"The first two requirements, validity and legal protectability, are proven where, as here, a mark was federally registered and has become 'incontestible'[2] under the Lanham Act, 15 U.S.C. Sections 1058 and 1065. If the mark has not been federally registered or, if registered, has not achieved incontestibility, validity depends on proof of secondary meaning,[3] unless the unregistered mark is inherently distinctive." *Fisons*, 30 F.3d at 472 (citations omitted).

---

[2]    A trademark is incontestible after the owner declares in an affidavit to the Commissioner of Patents that the mark has been registered, has been in continuous use for five consecutive years and that there has been no adverse decision concerning the registrant's ownership or right to registration. *Fisons*, 30 F.3d at 472 n. 7; 15 U.S.C. § 1065(3).

[3]    Acquired distinctiveness or "secondary meaning" is demonstrated where, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product itself. In this regard, a non-exclusive list of factors which may be considered includes the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion. *Ford Motor Co. v. Summit Motor Prod., Inc.,* 930 F.2d 277, 292 (3d Cir.), *cert. denied sub nom., Altran Corp. v. Ford Motor Co.,* 502 U.S. 939, 112 S. Ct. 373 (1991).

-15-

In the present case, Plaintiff's marks are registered with the USPTO on the Principal Register, which is reserved for distinctive marks, and are incontestible. In addition, Plaintiff has continuously used its QVC marks, since 1986, and its Q mark, since as early as 1994, for its electronic retail services. Plaintiff has extensively advertised and promoted its services under these marks. Further, there have been substantial sales of goods and services under the QVC and Q marks throughout the U.S. and the world.

Moreover, Plaintiff has all right, title and interest in and to Certificate of Registration 1,914,291, and the Q mark covered thereby, to bring this suit. Certificates of Registration Nos. 1,455,889, 1,512,144, 1,930,782, 1,945,357, 2,015,779 and 2,098,066 and the QVC marks covered thereby are subsisting in the name of ER Marks, Inc., a wholly-owned subsidiary of Plaintiff. Plaintiff is the exclusive licensee of ER Marks, Inc., and as exclusive licensee, Plaintiff is entitled to full and exclusive use of the QVC marks. Plaintiff has complete authorization to enforce these marks, including the right to seek injunctive relief and collect damages for infringement thereof.

### b. Defendant's Use of its Marks Is Likely to Cause Confusion.

Plaintiff respectfully submits that Defendant's use of Q VISION NETWORK, Q SHOP and Q SHOP TV is likely to cause confusion, to cause mistake and to deceive as to the affiliation, connection

-16-

or association of Defendant with Plaintiff and as to the origin, sponsorship or approval of Defendant's services by Plaintiff.

As noted above, a likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.

Whether use of a designation causes a likelihood of confusion with the use of another's trademark is determined by a consideration of the circumstances involved in the marketing of the respective goods or services and/or in the operation of the respective businesses of the parties. *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983). In the case of directly competing goods or services, where the marks are very similar, the court may evaluate likelihood of confusion based on the similarity of the marks alone. *See A & H Sportswear*, 237 F.3d at 214.

Plaintiff respectfully submits that both factors are present in this case. First, the parties' services – electronic retail shopping services featuring general merchandise – are identical in kind. They are directly competitive and move in similar trade channels to the same classes of purchasers.

Second, the parties' marks are confusingly similar. Marks "are confusingly similar if ordinary consumers would likely conclude that [the parties' services] share a common source, affiliation or sponsorship." *Fisons*, 30 F.3d at 477 (citations

-17-

omitted).  In this regard, the "appropriate test is not side-by-side comparison of marks, the emphasizing differences in detail, but whether average consumer, on encountering one mark in isolated circumstances of marketplace and having only general recollection of the other, would likely confuse or associate the two." *Id*. at 477-78 (citation omitted).  In other words, the test is whether the marks at issue create the same overall impression when viewed separately.  *Id*. at 477 (citation omitted).  "[I]f the overall impression created by marks is essentially the same, it is very probable that the marks are confusingly similar."  *Opticians*, 920 F.2d at 195 (citation and quotation omitted).

In evaluating the degree of similarity between the marks, each mark must be viewed in its entirety, giving greater force and effect to its dominant feature.  *Country Floors v. Partnership of Gepner and Ford*, 930 F.2d 1056, 1065 (3d Cir. 1991).  When the dominant portion of the two marks is the same, confusion is likely. *Id*.  Additionally, because the services of the parties are directly competitive, the degree of similarity required to be found to find likelihood of confusion is less.  4 J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 24.22 at 24-42 (4th ed. 2001) ("Where the goods or services are directly competitive, the degree of similarity of marks needed to cause likely confusion is less than in the case of dissimilar goods or services.").

In the present case, a comparison of the parties' marks shows that there is a high degree of similarity between the QVC and Q marks and the Q VISION NETWORK, Q SHOP and Q SHOP TV marks. Both parties' marks possess and begin with the letter "Q," and it is this feature that will most likely be impressed upon the minds of consumers and remembered. The terms VISION, NETWORK, SHOP and TV are all highly descriptive of Defendant's television home shopping services, and the letter Q serves as the means by which consumers will discriminate these services from others. It is the Q portion that is dominant and makes the greatest impact over the other elements of Defendant's marks. Thus, because the dominant feature of the parties' marks is identical, confusion is likely. *See Country Floors, Inc.*, 930 F.2d at 1065. The addition of the highly descriptive VISION, NETWORK, SHOP and/or TV terms does not avoid confusion. *Fisons*, 30 F.3d at 477. Rather, Defendant's use of the term Q in connection with electronic retail services can only be considered as an attempt by it to take for itself, the uniqueness and the good will which Plaintiff has created in its QVC and Q marks.

Therefore, because the marks at issue are confusingly similar and are used for identical services, Plaintiff respectfully submits that a likelihood of confusion is an inevitable result.

-19-

Consideration of other marketplace factors[4] further supports the conclusion that a likelihood of confusion exists between the parties' marks. The QVC and Q marks are both conceptually and commercially strong marks, entitling them to broad protection. Plaintiff's marks are federally registered, incontestable marks, and these incontestable registrations are indicative of these marks' inherent and acquired distinctiveness. Furthermore, as will be demonstrated at the hearing on this Motion by way of a consumer survey and Plaintiff's advertising expenditures and sales, the QVC

---

[4]    The Third Circuit has advised that whether or not the goods directly compete, the following factors, where relevant, should be considered to test for likelihood of confusion:

    (1)  the degree of similarity between the owner's mark and the alleged infringing mark;

    (2)  the strength of the mark;

    (3)  the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

    (4)  the length of time the defendant has used the mark without evidence of actual confusion arising;

    (5)  the intent of the defendant in adopting the mark;

    (6)  the evidence of actual confusion;

    (7)  whether the goods, competing or not, are marketed through the same channels of trade and advertised through the same media;

    (8)  the extent to which the targets of the parties' sales efforts are the same;

    (9)  the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

  (10)  other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

See *A & H Sportswear*, 237 F.3d at 214-15.

-20-

and Q marks are distinctive, famous and well-known among consumers.
In addition, both parties' target the same customer, the "at-home"
shopper, and both parties' services are marketed through identical
channels of trade and media – cable television and the Internet.
Thus, in light of the overall market context in which Q VISION
NETWORK, Q SHOP and Q SHOP TV marks are used, Defendant's use of
these marks is likely to cause confusion with Plaintiff's QVC and
Q marks.

Insofar as Defendant's intent in adopting the Q VISION
NETWORK, Q SHOP and Q SHOP TV marks is concerned,[5] because of the
renown of the QVC and Q marks and the popularity of Plaintiff's
services marketed thereunder, it is difficult to fathom any reason
for adopting virtually identical marks if Defendant did not intend
to obtain an unfair commercial advantage and trade upon the
goodwill of the QVC and Q marks.    In this respect, in *American
Express Co. v. Pan American Express*, 509 F. Supp. 348, 352 (E.D.
Pa. 1981), the court stated:

---

[5]    While the intent of a defendant is relevant to the extent
that it bears on the likelihood of confusion, a wrongful intent is
not a prerequisite to an action for trademark infringement, and
good faith is no defense. *Chips 'n Twigs, Inc. v. Chip-Chip, Ltd.*,
414 F. Supp. 1003, 1015 (E.D. Pa. 1976); *see also Wynn Oil Co. v.
Thomas*, 839 F.2d 1183, 1189 (6th Cir. 1988) ("the defendant's good
intentions do not in any way preclude a finding of a likely
confusion"; "While . . . we do consider intention to be relevant
when a plaintiff shows that a defendant knowingly copied the
contested trademark, we agree . . . that absent such a showing,
intentions are irrelevant.")

-21-

[W]e express concern over defendants' choice, from among the infinite variety of names and terms which could have been chosen as company names and service marks, of terms which so closely resemble the long, established, registered marks of the plaintiff.

Finally, it is important to note that actual confusion need not be shown to prevail under the Lanham Act, as actual confusion is very difficult to prove, *see A & H Sportswear,* 237 F.3d at 227, and the Act requires only a ***likelihood*** of confusion, not the proof of actual confusion. *Fisons*, 30 F.3d at 472. Thus, Plaintiff's motion for preliminary relief is appropriate in the present case, so actual confusion among consumers can be prevented before it starts and before significant costs have been incurred. As once stated by the Court of Appeals for the Tenth Circuit, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Standard Oil Co. v. Standard Oil Co.*, 56 F.2d 973, 976 (10th Cir. 1932) (citation omitted).

Plaintiff respectfully submits that the foregoing facts all point to the conclusion that Defendant's use of Q VISION NETWORK, Q SHOP and Q SHOP TV is likely to cause confusion, and to cause mistake, and to deceive as to the affiliation, connection, or association of Defendant with Plaintiff and as to the origin, sponsorship, and approval of Defendant's commercial activities by

Plaintiff.    Thus, Plaintiff should be entitled to injunctive relief.

### 2.    QVC is Likely to Prevail on its Claims of Trademark Dilution.

In addition to its federal and common law claims of trademark infringement and unfair competition, Plaintiff alleges trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c), and Pennsylvania statutory law, 54 Pa. C.S. § 1124.[6] As will be shown, Defendant's use of substantially similar marks reduces and weakens the ability of Plaintiff's famous QVC and Q marks to serve as unique identifiers of Plaintiff's electronic retail services.

In order to establish a dilution claim under the Federal Trademark Dilution Act of 1995 ("FTDA"), 15 U.S.C. § 1125(c), a plaintiff must prove the following: (1) plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of the eight factors listed in Section 1125(c)(1) of the Lanham Act; (2) defendant is making commercial use in interstate commerce of a mark; (3) defendant's use began after the plaintiff's mark

---

[6]    The wording for the Pennsylvania dilution statute, 54 Pa. C.S. § 1124, is taken almost verbatim from the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c). Accordingly, there is no appreciable difference in the applicable standard. *See Strick Corp. v. Strickland*, 162 F. Supp.2d 372, 378 n. 10 (E.D. Pa.2001). Thus, the facts which substantiate an action for dilution under the Lanham Act will support an action for dilution under the Pennsylvania dilution statute. Accordingly, Plaintiff will not distinguish between these causes of action and only the federal dilution action will be discussed for purposes of analysis.

-23-

became famous, and (4) defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services. *Times Mirror Magazines Inc. v. Las Vegas Sports News*, 212 F.3d 157, 163 (3d Cir. 2000), *cert. denied*, 531 U.S. 1071, 121 S.Ct. 760 (2001) (citations omitted).   All of these factors are present and satisfied in the instant case.

### a.    The QVC and Q Marks Are Famous.

Plaintiff respectfully submits that its QVC and Q marks are clearly famous and entitled to protection under the FTDA.   In determining whether a mark is "famous," the FTDA provides the following nonexclusive list of factors which a court may consider:

> (A)   the degree of inherent or acquired distinctiveness of the mark;
>
> (B)   the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
>
> (C)   the duration and extent of advertising and publicity of the mark;
>
> (D)   the geographical extent of the trading area in which the mark is used;
>
> (E)   the channels of trade for the goods or services with which the mark is used;
>
> (F)   the degree of recognition of the mark in the trading areas and channels of trade of the mark's owner and the person against whom the injunction is sought;

    (G)   the nature and extent of use of the same
or similar marks by third parties; and

    (H)   the existence of a registration under the
Act of March 3, 1881, or the Act of
February 20, 1905, or on the principal
register. 15 U.S.C. § 1125(c)(1)(A)-(H).

In the context of electronic retail services, it is hard to imagine a more famous and distinctive mark in the U.S. than QVC. Plaintiff's QVC and Q marks clearly fulfill all of the elements of the "famous and distinctive" requirements of the FTDA:

Plaintiff's QVC and Q marks are federally registered and incontestible, which are indicative of the distinctive quality of these marks. *See Times Mirror Magazines Inc. v. Las Vegas Sports News, L.L.C.*, 50 USPQ2d 1454, 1458 (E.D. Pa. 1999)*, aff'd*, 212 F.3d 157 (3d Cir. 2000), *cert. denied*, 531 U.S. 1071, 121 S.Ct. 760 (2001). In addition, when used in connection with the field of electronic retail services, QVC and Q are completely arbitrary, and fanciful marks, which are strong, inherently distinctive marks entitled to broad protection. *See McNeil Consumer Brands, Inc. v. U.S. Dentek Corp.*, 116 F. Supp.2d 604, 607 (E.D. Pa. 2000).

In addition, the QVC and Q marks have certainly become distinctive in view of their continuous and exclusive use, extensive advertising and substantial sales. Indeed, since 1986 and 1994, the QVC and Q marks, respectively, have been advertised and publicized extensively throughout the U.S., as evidenced, among

-25-

other factors, by its television shopping network, which reaches more than 82 million households in the U.S. and by its far-reaching Internet retailing service, QVC.COM, and its recording of sales figures in 2001 of more than $3.9 billion.

Further, the reality of the present day marketplace is that consumers shop for goods and services through a broad range of distribution channels – from retail stores to mail-order catalogs to at-home shopping services offered via television and the Internet – and Plaintiff markets its QVC and Q services through all of these marketing and advertising channels.

As will be shown at the hearing on this motion, there is a high degree of recognition of Plaintiff's QVC and Q marks in the field of electronic retail services and amongst consumers. Additionally, to the best of Plaintiff's knowledge, there are no marks or names similar to its unique and distinctive QVC and Q marks.

Finally, Plaintiff's QVC and Q marks are registered on the Principal Register and have become incontestible.

Accordingly, Plaintiff respectfully submits that its QVC and Q marks are famous in the electronic retail services market.

### b. Defendant's Commercial Use of its Marks Began after the QVC and Q Marks Became Famous.

With regard to the second and third elements of a dilution claim, it is clear that Q VISION is making commercial use in interstate commerce of the Q VISION NETWORK, Q SHOP and Q SHOP TV marks, by using these marks to identify its infomercial and television shopping programs and its online retail services. Furthermore, it is respectfully submitted that such use began after the QVC and Q marks became famous. The WHOIS records for the QSHOP.TV, QSHOPTV.COM and QVISIONNETWORK.COM domain names show that Defendant registered these domain names on November 13, 2001, December 20, 2001 and February 23, 2002, respectively – which is well after Plaintiff's QVC and Q marks became famous.

### c. Defendant's Use Causes Dilution of the QVC Mark.

Finally, the present circumstances demonstrate that Defendant's use of its Q VISION NETWORK, Q SHOP and Q SHOP TV marks causes dilution of Plaintiff's famous QVC and Q marks.

The FTDA defines the term "dilution" to mean the "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of a famous mark and other parties, or (2)

likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127.

The legislative history of the FTDA further explains:

> . . . [Section 43(c)] create[s] a federal
> cause of action to protect famous marks from
> unauthorized users that attempt to trade upon
> the goodwill and established renown of such
> marks and, thereby, dilute their distinctive
> quality. The provision is intended to protect
> famous marks where the subsequent,
> unauthorized commercial use of such marks by
> others dilutes the distinctiveness of the
> mark. . . .

> The protection of marks from dilution
> differs from the protection accorded marks
> from trademark infringement. Dilution does
> not rely upon the standard test of
> infringement, that is, likelihood of
> confusion, deception or mistake. Rather it
> applies when the unauthorized use of a famous
> mark reduces the public's perception that the
> mark signifies something unique, singular, or
> particular.

H.R. Rep. No. 374, 104th Cong., 1st Sess. 1995, 1996 U.S.C.C.A.N.

1029. The distinct function of a dilution cause of action, as

opposed to an infringement action was explained by Professor

McCarthy in his treatise as follows:

> For dilution to occur, the relevant
> public must make some connection between the
> mark and both parties. But that connection in
> not the kind of mental link between the
> parties that triggers the classic likelihood
> of confusion test. Rather, the assumption is
> that the relevant public sees the junior
> user's use, and intuitively knows, because of
> the context of the junior user's use, that
> there is no connection between the owners of
> the respective marks. However, even with
> those who perceive distinct sources and

-28-

> affiliation, the ability of the senior user's
> mark to serve as a unique identifier of the
> plaintiff's goods or services is weakened
> because the relevant public now also
> associates that designation with a new and
> different source. Hence, the unique and
> distinctive link between the plaintiff's mark
> and its goods or services is "blurred."

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §24.70 p. 24-118 (4th ed. 2001) (cited with approval in *Times Mirror*, 212 F.3d at 163).

Such is the situation presented by Defendant's use of the Q VISION NETWORK, Q SHOP and Q SHOP TV marks. It does not matter that consumers may not mistakenly believe that Defendant's Q VISION NETWORK, Q SHOP and Q SHOP TV services are actually Plaintiff's. Actionable dilution occurs because the distinctive quality of the QVC and Q marks, that was once exclusively associated with QVC, is now diminished by Defendant's use of substantially similar marks. The mental association between the parties and the parties' marks is especially compelling here, given the renown of Plaintiff's QVC and Q marks and the Defendant's use of its marks in connection with identical services in the same channels of trade.[7] This loss of

---

[7]    In considering a dilution claim, the Third Circuit in *Times Mirror* indicated that a court may consider the following factors: (1) similarity of the marks; (2) similarity of the products covered by the marks; (3) sophistication of consumers; (4) predatory intent; (5) renown of the senior mark; and (6) renown of the junior mark. *Times Mirror*, 212 F.3d at 168-169. The Court also suggested that a district court may consider additional factors including actual confusion and likelihood of confusion, shared customers and geographic isolation, the adjectival quality

-29-

exclusivity, this dilution of the distinctive QVC and Q marks, this weakening of Plaintiff's marks as unique identifiers of source, are what must be enjoined.

### D. The Balance of Hardships Tips Decidedly in QVC's Favor and the Public Will Suffer Harm If an Injunction Does Not Issue.

When evaluating this third factor of the preliminary injunction analysis, a court must "undertake to balance the hardships to the respective parties." *Pappan*, 143 F.3d at 805. "[T]he basic purpose behind the balancing analysis is to ensure that the issuance of the injunction would not harm the infringer more than a denial would harm the mark's owner." *Opticians*, 920 F.2d at 197.

Under the present facts, the balance of hardship weighs heavily in Plaintiff's favor. Plaintiff respectfully submits that it has established a likelihood of success on the merits and irreparable injury resulting from Defendant's acts of infringement, dilution and unfair competition.

Plaintiff has expended substantial sums of money over the years in promoting and advertising its goods and services and has continuously sold substantial amounts of goods and services under its QVC and Q marks. Furthermore, Plaintiff continues to grow and

---

of the junior user, and the interrelated factors of duration of the junior user, harm to the junior user, and delay by the senior user in bringing the action. *Id.*

-30-

expand in a program of continuous growth and expansion.  The QVC and Q marks are used with every aspect of Plaintiff's business.

Defendant cannot complain that it will suffer injury if a preliminary injunction is issued.  Plaintiff respectfully submits that Defendant intentionally attempted to trade upon the goodwill and established renown of Plaintiff's QVC and Q marks, with full knowledge of Plaintiff's rights, in order to enhance his electronic retail services.  Despite requests to cease its use and attempts to resolve this dispute, Defendant has continued to promote and market its services under the infringing Q VISION NETWORK, Q SHOP and Q SHOP TV marks.  Defendant can hardly claim to be harmed, because it misappropriated the distinctiveness of Plaintiff's QVC and Q marks with full knowledge of Plaintiff's rights.  *See Pappan*, 143 F.3d at 806 ("the self-inflicted nature of any harm suffered by [the defendant] also weighs in favor of granting preliminary injunctive relief"); *Opticians*, 920 F.2d at 197 (by virtue of its recalcitrant behavior, party cannot "hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself.").

Even if it could so complain, it is highly unlikely that Defendant will suffer irreparable harm if a preliminary injunction is issued.  An injunction would not prevent Defendant from offering its shop-at-home services on television, the Internet or anywhere else, in connection with other names and marks.  Defendant would be

-31-

able to continue offering its services, provided that the new names and marks do not create a likelihood of confusion with or dilution of the Plaintiff's QVC and Q marks. Moreover, Defendant has only recently been using its infringing marks, compared with Plaintiff's substantial use of its famous marks since 1986.

Thus, any injury Defendant might suffer as a result of the issuance of a preliminary injunction is outweighed by the irreparable harm Plaintiff would suffer as a result of Defendant's use of the Q VISION NETWORK, Q SHOP and Q SHOP TV marks. It is clear that Plaintiff has and will continue to suffer harm because of Defendant's actions. Defendant's use diminishes the value of the Plaintiff's marks, business and goodwill. These are hardships which the Plaintiff will be forced to bear if an injunction is not granted.

Finally, where a party demonstrates both the likelihood of success on the merits and irreparable harm, "it almost always will be the case that the public interest will favor" the issuance of an injunction. *American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994), *cert. denied*, 115 S.Ct. 1838 (1995). The policy of the trademark law is to protect the public from confusion. In a trademark case, public interest "is most often a synonym for the right of the public not to be deceived or confused." *Opticians*, 920 F.2d at 197 (citations omitted). Protection of the public from confusion through the

-32-

grant of a preliminary injunction is a policy favored and followed in this Court.  In *American Diabetes*, the Court stated, 533 F. Supp. at 21:

> There are several competing policy inter-
> ests active in shaping the law of trademark
> infringement.  One of these, plaintiffs'
> concern that the fruits of their labor not be
> misappropriated, has been discussed in some
> detail.  The basic policy of trademark law,
> however, is the protection of the public from
> confusion.  In this case, the public will
> benefit from a preliminary injunction because
> they will be protected from misdirecting any
> funds, and other harms, as a result of becom-
> ing confused between the two charities.

> Against these interests must be weighed
> the concern for creating a healthy competition
> wherever possible in our economy and the harm
> which will accrue to defendants in particular.
> The only perceivable harm to defendants is
> that the National Diabetes Association will be
> delayed in its fundraising activities until
> final adjudication of this matter.  As to the
> possibility of a preliminary injunction throt-
> tling a healthy spirit of competition in this
> case, it need only be said that, whenever
> competing policy interests meet, inevitably
> the lesser must be compromised.

In addition, "because it was the purpose of Congress in amending the Lanham Act to provide protection to the owners of famous marks from dilution by persons who wish to trade on the famous nature of the senior mark," a preliminary injunction will serve the public interest.  *See Wawa Inc. v. Haaf*, 40 USPQ2d 1629, 1633 (E.D. Pa. 1996), *aff'd w/o op.*, 116 F.3d 471 (3d Cir. 1997).

In the present case, these policies will be fostered by the

granting of a preliminary injunction.  As seen from the evidence, Defendant's Q VISION NETWORK, Q SHOP and Q SHOP TV marks are likely to cause confusion with and dilution of Plaintiff's QVC and Q marks, and thus, Plaintiff has and will suffer irreparable harm. Consequently, the public interest lies primarily, consistent with the intent of the Lanham Act, in protecting Plaintiff's marks.  The issuance of an injunction will protect the public from the deceptive and unlawful use of the QVC and Q marks by Defendant. Accordingly, the issuance of a preliminary injunction is warranted.

**III.  CONCLUSION.**

For all of the foregoing reasons, preliminary injunctive relief should be granted to QVC, Inc. to preserve the *status quo ante*.  The use of Q VISION NETWORK, Q SHOP and Q SHOP TV by Defendant infringes and dilutes QVC, Inc.'s federally registered QVC and Q marks.  QVC Inc. will suffer irreparable injury if Defendant is allowed to continue to use Q VISION NETWORK, Q SHOP and Q SHOP TV as its marks, and that the balance of hardships and public interest weigh in favor of granting injunctive relief.

Accordingly, the relief is warranted and respectfully requested.

Respectfully submitted,

**CAESAR, RIVISE, BERNSTEIN,**
**COHEN & POKOTILOW, LTD.**

Dated: June 10, 2002

By _____
Manny D. Pokotilow  (ID# 13310)
Salvatore Guerriero (ID# 83680)
Seven Penn Center - 12th Floor
1635 Market Street
Philadelphia, PA  19103-2212
(215) 567-2010

*Attorneys for Plaintiff,*
*QVC, Inc.*

-35-